## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CASSANDRA M. WATSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-221 Erie |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., J.

Plaintiff, Cassandra M. Watson, commenced the instant action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security denying her claims for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401 *et seq,* and § 1381 *et seq.* Watson filed applications for DIB and SSI in October 2004 alleging disability since October 2, 2004 due to asthma, bronchitis, depression and anxiety (Administrative Record, hereinafter "AR", 58-67; 93-94; 510-511). Her applications were denied, and she requested a hearing before an administrative law judge ("ALJ") (AR 38-43; 48-50; 513-517). A hearing was held before an administrative law judge ("ALJ") on December 14, 2005 (AR 543-578). Following this hearing, the ALJ issued a written decision on January 25, 2006 finding that Watson was not entitled to a period of disability, DIB or SSI under the Act (AR 15-28). Her request for review by the Appeals Council was denied (AR 9-12), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). The instant action challenges the ALJ's decision. Presently pending before the Court are cross-motions for summary judgment. For the reasons set forth below, we will grant Defendant's motion and deny Plaintiff's motion.

### I. BACKGROUND

Watson was born on February 12, 1984 and was twenty-one years old on the date of the

---

[1]Michael J. Astrue became the Commissioner of Social Security on February 12, 2007. Pursuant to Fed.R.Civ.P. 25(d)(1) and 42 U.S.C. 405(g), he is automatically substituted as the defendant in this case.

ALJ's decision (AR 27).  She is a high school graduate and previously worked as a sales associate, pizza delivery person, janitor, fast food worker and insurance agent (AR 77).  Watson has claimed disability due to both physical and mental impairments.

A.      *Physical impairments*

Watson's primary care physician was Frank McLaughlin, D.O.[2] who treated her for a variety of ailments, including asthma and asthmatic bronchitis (AR 184-291).  On October 19, 2004, Watson presented in the emergency room at Meadville Medical Center complaining of a cough with streaks of blood, slight shortness of breath, dizziness and a headache (AR 293).  She reported a past medical history of depression, morbid obesity, Factor V Leiden deficiency[3] and asthma (AR 293).  The attending physician noted that despite her family history, she continued to smoke a pack of cigarettes per day (AR 293).  A chest x-ray showed no pulmonary parenchymal infiltrates, mass lesions or effusions (AR 293).  She was diagnosed with acute bronchitis, prescribed an antibiotic and advised to quite smoking (AR 293).

Dr. McLaughlin's treatment notes for the remainder of October 2004 reflect that Watson continued to complain of increased cough and dyspnea and physical examination of her lungs revealed harsh breath sounds and scattered rhonchi (AR 189-192).  She was prescribed various inhalers and administered nebulizer treatments to improve her air flow (AR 189-192).

On November 12, 2004, Watson requested that Dr. McLaughlin complete disability forms due to her asthma (AR 188).  Physical examination of her lungs revealed scattered rhonchi through all lung fields (AR 188).  She was assessed with asthma and tobacco abuse (AR 188).  Dr. McLaughlin completed Watson's disability forms indicating she was temporarily disabled for one month (AR 188).  It was noted that she was scheduled to see a pulmonary specialist later that day and he could determine whether her disability should continue (AR 188).

Watson was subsequently evaluated by William D. Sullivan, M.D., a pulmonary disease

---

[2]Dr. McLaughlin is no relation to the undersigned.

[3]Factor V Leiden is a hereditary blood coagulation disorder which causes thrombophilia, which is the propensity of some people to form abnormal blood clots.  Deborah L. Orstein, M.D. and Mary Cushman, M.D., M.Sc., Factor V Leiden, Cardiology Patient Page, American Heart Association, Inc., (April 2003).

specialist (AR 168-169).  She reportedly smoked a pack of cigarettes per day for the last seven years (AR 168).  Watson recounted a history of asthma since she was a child and frequent upper respiratory infections which "set off" her asthma (AR 168).  She also claimed her asthma was exacerbated by temperature changes, cats, perfumes and cleaning fluids (AR 168).  Dr. Sullivan noted an expiratory wheeze on physical examination (AR 168).  He formed an impression of extrinsic asthma and allergic rhinitis and prescribed medication (AR 168).  Dr. Sullivan reported that he had a "long talk" with Watson and her mother, and informed them that she would not get better if she continued to smoke (AR 169).  He noted that the medication prescribed would help but she had to start taking responsibility for her own care and discontinue smoking (AR 169).

On November 17, 2004, Watson was hospitalized for complaints of chest pain and shortness of breath (AR 137-144).  Diagnostic studies revealed bilateral pulmonary emboli and a right atrial thrombus extending towards her right ventricle (AR 139; 143; 302).  She was treated with thrombolytic therapy and heparinzation (AR 137).  She was then maintained on Coumadin, an anticoagulant (AR 137).  Watson was also treated for an exacerbation of her asthma and a lower respiratory tract infection (AR 137; 139; 143).

Dr. McLaughlin completed an Employability Assessment Form for the Department of Public Welfare on November 20, 2004 and opined that Watson was temporarily disabled for a period of three months, from November 22, 2004 until February 22, 2005, due to a primary diagnosis of asthma and a secondary diagnosis of pulmonary emboli (AR 490-491).

Watson returned to Dr. McLaughlin for follow up on November 29, 2004 (AR 187).  He reported that she was doing "very well" after her bilateral pulmonary emboli and he continued her medications (AR 187).

Watson sought emergency room treatment on December 6, 2004 for a cough, runny nose and a ten second episode of sharp discomfort over her second left costochondral joint (AR 292).  A chest x-ray showed bilateral atelectasis at the bases, but the examining physician did not find it indicative of more pulmonary emboli (AR 292).[4]  He noted that she was well anticoagulated (AR 292).  She was assessed with bilateral lower lobe atelectasis post pulmonary embolus and an

_____

[4]Atelectasis is the collapse of all or part of the lung.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY at 17 (27th ed. 1988).

upper respiratory infection (AR 292).  She was discharged in stable condition (AR 292).

On December 13, 2004, Dr. McLaughlin continued to report that Watson was doing well (AR 186).  He noted that she had a "touch" of wheezing but was breathing much better than ususal (AR 186).  Her lungs were clear to auscultation bilaterally and she exhibited +5/5 muscle strength in all extremities (AR 186).  Dr. McLaughlin assessed her with a history of pulmonary embolism and high risk medication, i.e., Coumadin (AR 186).

Watson presented to the Meadville Medical Center on December 21, 2004 complaining of abdominal pain, nausea and vomiting (AR 175-176).  She was assessed with gastrointestinal flu and further tests were ordered to rule out a recurrent pulmonary embolism and to determine if there was any evidence of residual right atrial thrombus (AR 173-174; 176).  A CT scan of Watson's chest showed some extension of her right pulmonary embolus, but her left pulmonary embolus had resolved (AR 180).  An echocardiogram/doppler study revealed no evidence of a right atrial clot (AR 179).  During her admission, Dr. McLaughlin reported that Watson was "very upset" and "very noncompliant", refused to answer a consulting physician's questions, fought with the hospital staff and signed herself out against medical advice on December 22, 2004 (AR 171; 177).

Watson returned to Dr. McLaughlin on January 13, 2005 complaining of teeth problems and headaches, but had no other complaints (AR 185).  Dr. McLaughlin reported that her lungs were clear to auscultation and she had no cardiac abnormalities (AR 185).  Her muscle strength was still +5/5 in all extremities (AR 185).  She was continued on Coumadin (AR 185).

On March 28, 2005, V. Rama Kumar, M.D., a state agency reviewing physician, reviewed the medical evidence of record and found that Watson was capable of performing work at the light exertional level (AR 316).[5]  He further concluded that she could never balance, kneel or crawl, and was precluded from working around certain environmental conditions (AR 317; 319).

On June 11, 2005 Watson presented to the emergency room with a chief complaint of wheezing, and due to her past medical history, she was admitted for further assessment (AR

---

[5]Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds, and requires a good deal of walking or standing. 20 C.F.R. §§ 404.1567(b), 416.967(b).  The ability to engage in light work subsumes the ability to engage in sedentary work.  Id.

390).  Physical examination revealed she was in moderate distress due to shortness of breath and her lungs were diffuse with wheezing (AR 390).  She reported that she did not smoke (AR 390).  Treatment consisted of high doses of steroids and a hand-held nebulizer (AR 391).  She was discharged three days later in stable condition (AR 392).

On September 1, 2005, Watson complained of increased wheezing, coughing and mild shortness of breath (AR 427).  A few scattered wheezes were noted on physical examination (AR 427).  A CT scan of her chest conducted that same date revealed no evidence of pulmonary emboli in her main arteries but subsegmental atelectasis was seen in her right lower lobe (AR 380-381).  She was prescribed medication (AR 427).  At her remaining follow up examinations in September 2005 Dr. McLaughlin reported that her lungs were clear to auscultation with good effort with no rales or rhonci noted (AR 429-430).

Watson sought emergency room treatment on October 1, 2005 for shortness of breath and coughing (AR 382).  She admitted that she continued to smoke even though she knew it was bad for her asthma (AR 382).  Physical examination showed scattered expiratory wheezing and occasional inspiratory rales in her lower left lung (AR 382).  A chest x-ray revealed no evidence of acute pulmonary pathology but showed a small amount of atelectasis in her right lower lung (AR 384).  She was diagnosed with exacerbation of her asthma and underlying bronchitis, treated with an antibiotic and prednisone and discharged in stable condition (AR 382-383).  She was again advised to quit smoking (AR 382).

In November 2005, Dr. McLaughlin reported that Watson's lung sounds continued to reveal some faint scattered wheezes throughout, but she was much improved (AR 489).  Her heart continued to have regular rate and rhythm without murmurs and her muscle strength remained equal at +5/5 in all extremities (AR 489).  A follow up CT scan revealed no pulmonary emboli and since her status appeared to be stable, Dr. McLaughlin continued her medication regime (AR 489).

   B.    Mental impairments

On January 12, 2005, Frank Yoho, M.D., a psychiatrist, reported that he had treated Watson between May 20, 2004 and June 10, 2004 for recurrent major depression (AR 161).  He reported that he had prescribed Prozac, but Watson failed to keep her appointments and dropped

5

out of treatment before her response could be evaluated (AR 161).  Dr. Yohe opined that she had no difficulties performing activities of daily living and her ability to sustain concentration, persistence and pace was unaffected by her mental condition, but she had difficulty getting along with others at times (AR 164).  He found she was only slightly limited in her ability to understand, remember and carry out detailed instructions; make simple work-related decisions; interact appropriately with the public, supervisors and co-workers; and respond appropriately to pressures and changes in a routine work setting (AR 166).

On April 18, 2005, Watson underwent a consultative psychological evaluation performed by J. Alexander Dale, Ph.D. (AR 324-333).  Watson reported suffering from depression, anxiety and anger (AR 324).  Dr. Dale reported that she was cooperative during the evaluation, her eye contact was off and on, she had some hyperventilation which indicated anxiety, her mood was depressed, she was "in and out" of tears during the evaluation, and her range of emotionality was labile (AR 327).  She was able to perform simple arithmetic adequately, her fund of knowledge was mixed, she was very well oriented to time, place and person and her remote and recent memory were good (AR 329).  Watson reported impulse control problems and that she fought with her family, smashed things and hit her head on the mirror (AR 329).  She further reported that she was not receiving counseling since she lost her insurance (AR 329).

Dr. Dale diagnosed her with major depression, rule out bipolar disorder and borderline personality disorder (AR 329).  He opined that she was moderately limited in her ability to understand, remember and carry out instructions; interact appropriately with the public, supervisors and co-workers; and respond appropriately to pressures and changes in a routine work setting (AR 332).

On May 10, 2005, Sanford Golin, Ph.D., a state agency reviewing psychologist, reviewed the medical evidence of record and concluded that Watson's mental impairments did not meet or equal the requirements of Listings 12.04 (Affective Disorders) or 12.08 (Personality Disorders) (AR 334-346).  Dr. Sanford opined that Watson was not significantly limited or only moderately limited in her ability to engage in work-related mental activities (AR 347-348).  In rendering his opinion, Dr. Sanford noted that he accorded Dr. Dale's opinion great weight and adopted his assessment (AR 349).  He concluded that Watson's limitations resulting from her impairments did not preclude her from meeting the basic mental demands of competitive work on a sustained

basis (AR 349).

Watson returned to Dr. Yohe on May 22, 2005 (AR 311).  Dr. Yohe reported that her

mood was depressed, her thought process and attention/concentration were "okay," and her

prognosis was fair (AR 311).  Dr. Yohe assigned her a Global Assessment of Functioning

("GAF") score of 50 (AR 311).[6]  He noted that she was not taking any antidepressants, and

restarted her on Prozac (AR 311).

On June 22, 2005, John Topalanchik, M.S., from Action Review Group, Inc., submitted a

vocational/medical report (AR 495-496).  Mr. Topalanchik opined that based upon the review of

Watson's social security file by Ronald Refice, Ph.D., a psychologist, Watson's mental

impairments met the requirements of Listings 12.04 (Affective Disorders) and 12.08 (Personality

Disorders) (AR 495).  Mr. Topalanchik further opined that Watson had no residual functional

capacity (AR 496).

Watson was voluntarily hospitalized on August 2, 2005 for increased frustration and

depression and suicidal ideation (AR 385; 388).  She reported that she had been only sporadically

compliant with her antidepressant medication and had discontinued counseling due to a lack of

insurance (AR 385).  Gerard Francis, M.D., diagnosed Watson with dysthymia, major depressive

disorder, recurrent, severe, and post traumatic stress disorder features, and assigned her a GAF

score of 35 (AR 386).[7]  She was started on Zoloft and Dr. Francis noted that she seemed to

benefit from her participation in two therapy sessions while hospitalized (AR 388).  On August

4, 2005, Watson reported that her mood was 8/10 and requested discharge (AR 388-389).  She

reportedly had plans to go back to school, work and move to Pittsburgh and stay with a friend

(AR 389).  Dr. Francis reported that the staff had no concerns, and he saw no reason to keep her

---

[6]The GAF score considers psychological, social, and occupational functioning on a
hypothetical continuum of mental health-illness.  Scores between 41 and 50 indicate "[s]erious
symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious
impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."
*See Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34 (4th ed. 2000).

[7]Scores between 31 and 40 indicate "[s]ome impairment in reality testing or
communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in
several areas, such as work or school, family relations, judgment, thinking, or mood (e.g.,
depressed man avoids friends, neglects family, and is unable to work[.]" *Id.*

any further (AR 389).  She was assigned a GAF score on discharge between 55 and 60 (AR 388).[8]

Finally, Stairways outpatient treatment notes reflected that Watson was seen by a nurse practitioner on October 18, 2005 for depression and stress management, who noted that she had not been on any medications for several months (AR 508-509).  Watson claimed she stopped taking Zoloft because it interfered with her anticoagulant medication (AR 508).  She reportedly took Effexor, Prozac and Lexapro in the past but they had not helped her symptoms (AR 508).  The nurse practitioner reported that Watson was not suicidal and she declined an appointment with Dr. Qureshi (AR 508).  Her appointment was rescheduled with another psychiatrist at his first available appointment (AR 508).

At the administrative hearing held by the ALJ on December 14, 2005, Watson testified that she participated in therapy for her mental impairments beginning in October 2004, but stopped attending after approximately two months due to a lack of insurance (AR 551).  She resumed therapy in October 2005 (AR 550-551).  She further testified that although she was not undergoing therapy between December 2004 and October 2005, she was seen by a psychiatrist approximately every three months during that time frame (AR 550-551).  Watson indicated that she was compliant with her medication regime but it did not relieve her symptoms of depression and anxiety (AR 552).  She claimed she was sad "a lot," was "afraid of different things" including doctors and hospitals, had sleep difficulties, had difficulty getting along with others, had attention, concentration and attention problems, suffered from crying spells two or three times per day, yelled at strangers once a week and felt worthless and hopeless (AR 552-553; 570-571).  She was able to read and watch television, and depending upon the content, was able to remember the material (AR 554).  Watson claimed that she left the hospital in December 2004 against medical advice following treatment for nausea because she was scared and had an anxiety attack (AR 569).

With respect to her physical impairments, Watson testified that she became short of

---

[8]Scores between 51 and 60 indicate only "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).  *Id.*

breath on exertion and at rest (AR 554).  She further testified that she had never undergone any pulmonary function studies (AR 544).  Watson indicated that during the past year, she had been hospitalized four or five times for her lung condition, and sought emergency room treatment approximately ten times (AR 555-556).  She used a nebulizer approximately four days per week three times a day, but acknowledged that she did not use it as prescribed (AR 556).  She also used inhalers which were effective in helping her breathing condition (AR 557).  She suffered from nightly asthma attacks for which she used a nebulizer treatment (AR 572).  Watson further testified that she was allergic to bee stings, cats and numerous medications, and also suffered from seasonal allergies (AR 558).

In addition to her pulmonary problems, Watson described an ongoing problem with blood clots for which she took medication, which prevented clot formation most of the time (AR 560).  She testified that the first time she had a blood clot problem was in October 2004, but she had not had any significant problems since April 2005 (AR 560).  With respect to her activities, Watson testified that she was able to drive but for only thirty minutes at a time and did not require any assistive device to walk (AR 550; 566).  She was able to attend to her personal needs, wash dishes occasionally and engage in other chores with assistance (AR 561).  She could walk at a slow pace for approximately five minutes before becoming short of breath, stand for five minutes, sit only for thirty minutes in order to avoid blood clots in her legs and lift ten pounds (AR 561-563).  She testified that her physician advised her to walk periodically and elevate her legs if they started to swell (AR 562).  Watson indicated that she liked to go fishing and camping, but had not gone camping in the past year and had only been fishing twice (AR 563-564).

Watson further testified that she attended school since September 2005 and was studying to become a legal assistant (AR 564).  It was her intent to work part-time once she completed the 18-month course (AR 565).  Her classes were four days per week, but she usually only attended two days per week (AR 564).  Her teachers allowed her to work at home when she did not feel well and extended due dates for assignments (AR 564-565).  She testified that she often fell asleep in class or while studying (AR 565-566).  She had good days and bad days, with the bad days occurring about five days per week where she stayed in bed and slept (AR 572).

Karen Krull, a vocational expert, also testified at the hearing.  The ALJ asked the vocational expert to assume an individual of the same age, education and work experience as

Watson, who was limited to light work activity but could not be exposed to pulmonary irritants such as dust, mold or fumes, or extremes of temperature or humidity, and could not engage in climbing or balancing. (AR 573-574). Such individual would be further limited to performing simple and repetitive work in routine work settings, no more than incidental interaction with the public, and no high stress work, meaning work not involving high quotas or close attention to quality production standards (AR 574). The vocational expert opined that such an individual could perform the light jobs of file clerk, general office clerk and security guard (AR 574). The vocational expert further testified that such an individual could perform the following sedentary jobs with a sit/stand option: alarm monitor, hand packer, billing clerk and order clerk (AR 575). Finally, the expert testified that such an individual would not be able to sustain employment if she were randomly absent three days per month, off task ten to fifteen percent of the workday for an extended period of time, or acted inappropriately to supervision (AR 576).

Following the hearing, the ALJ issued a written decision which found that Watson was not entitled to a period of disability, DIB or SSI within the meaning of the Social Security Act (AR 18-28). Her request for review by the Appeals Council was denied rendering the ALJ's decision the final decision of the Commissioner (AR 9-12). She subsequently filed this action.

## II. STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)); *see Richardson v. Parales,* 402 U.S. 389, 401 (1971). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson,* 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.,* 48 F.3d 114, 117 (3d Cir. 1995).

## III. DISCUSSION

Title II of the Social Security Act provides for the payment of disability insurance benefits to those who have contributed to the program and who have become so disabled that they are unable to engage in any substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). Title XVI of the Act establishes that SSI benefits are payable to those individuals who are similarly

disabled and whose income and resources fall below designated levels. 42 U.S.C. § 1382(a). A person who does not have insured status under Title II may nevertheless receive benefits under Title XVI. *Compare* 42 U.S.C. § 423(a)(1) *with* 42 U.S.C. § 1382(a). In order to be entitled to DIB under Title II, a claimant must additionally establish that her disability existed before the expiration of her insured status. 42 U.S.C. § 423(a), (c). The ALJ found that Watson met the disability insured status requirements of the Act through June 30, 2006 (AR 18). SSI does not have an insured status requirement.

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an individual meets this definition:

> In the first two steps, the claimant must establish (1) that he is not engaged in "substantial gainful activity" and (2) that he suffers from a severe medical impairment. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). If the claimant shows a severe medical impairment, the [Commissioner] determines (3) whether the impairment is equivalent to an impairment listed by the [Commissioner] as creating a presumption of disability. *Bowen*, 482 U.S. at 141. If it is not, the claimant bears the burden of showing (4) that the impairment prevents him from performing the work that he has performed in the past. *Id.* If the claimant satisfies this burden, the [Commissioner] must grant the claimant benefits unless the [Commissioner] can demonstrate (5) that there are jobs in the national economy that the claimant can perform. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3rd Cir. 1985).

*Jesurum*, 48 F.3d at 117. The ALJ determined that Watson's asthma, depression, anxiety and borderline personality disorder were severe impairments, but determined at step three that she did not meet a listing (AR 20; 24). Despite her impairments, the ALJ found that she was able to perform the exertional demands of light work, with no exposure to pulmonary irritants or extremes of temperature or humidity, and no climbing or balancing (AR 25). She was further limited to simple, routine, repetitive work with no more than incidental interaction with the public involving no high stress, defined as no high quotas and no close attention to quality

production standards (AR 25).  At the final step, the ALJ concluded that Watson could perform the jobs cited by the vocational expert at the administrative hearing (AR 28).  The ALJ additionally determined that Watson's statements concerning the intensity, duration and limiting effects of her symptoms were not entirely credible (AR 25).  Again, we must affirm this determination unless it is not supported by substantial evidence.  *See* 42 U.S.C. § 405(g).

Watson first argues that the ALJ failed to recognize that her genetic blood clotting disorder was a severe impairment.  Step two of the sequential evaluation process focuses on whether the claimant is suffering from a severe impairment.  20 C.F.R. §§  404.1520(c), 416.920(c).  An impairment is severe if it significantly limits the individual's ability to do basic work activities.  *Santise v. Schweiker*, 676 F.2d 925, 927 (3rd Cir. 1982); *see also* 20 C.F.R. §§ 404.1521(a), 416.921(a).  Basic work activities are "abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling."  *Newell v. Comm'r of Social Security*, 347 F.3d 541, 546 (3rd Cir. 2003).  Here, the ALJ recognized that Watson was diagnosed with Factor V Leiden deficiency and that it had resulted in a cardiac thrombus and bilateral pulmonary emboli requiring hospitalization (AR 22).  He did not, however, find that this condition was a severe impairment.

We find no error in this regard.  We recognize that the step two inquiry is a *de minimus* screening device used to dispose of groundless claims and reasonable doubts on severity are to be resolved in favor of the claimant.  *Newell*, 347 F.3d at 546-47.  In this case however, the ALJ did not deny benefits at this stage of the evaluation; he continued on to step five considering this impairment as part of Watson's overall claim for disability (AR 560-561).  Specifically, the ALJ stated at the administrative hearing that he considered this impairment a transient condition, but would consider it "as part of her overall claim of disability for the entire period of time" even though it did not meet the 12-month durational requirement as an independent condition (AR

560).[9]  Thus, while the ALJ did not find this impairment was severe, he nonetheless considered

its impact in fashioning Watson's residual functional capacity by precluding her from climbing

and balancing, and further finding she could perform sedentary jobs that allowed for a sit/stand

option (AR 28, 575).

In a similar argument, Watson contends that the ALJ erred in failing to consider her

obesity pursuant to Social Security Ruling ("*SSR*") 02-01p.[10]  We find this contention without

merit in light of the Third Circuit's recent decision in *Rutherford v. Barnhart*, 399 F.3d 546 (3rd

Cir. 2005).  In *Rutherford,* the court addressed the issue of whether an ALJ's failure to mention a

claimant's obesity warranted a remand, stating:

> An ALJ is required to consider impairments a claimant says he has,
> or about which the ALJ receives evidence.  Although [the
> claimant] did not specifically claim obesity as an impairment
> (either in his disability application or at his hearing), the references
> to his weight in his medical records were likely sufficient to alert
> the ALJ to the impairment.  Despite this, any remand for explicit
> consideration of [the claimant's] obesity would not affect the
> outcome of this case.  Notably, [the claimant] does not specify how
> his obesity further impaired his ability to work, but speculates
> merely that his weight makes it more difficult to stand and walk.
> Additionally, the ALJ adopted the limitations suggested by the
> specialists and reviewing doctors, who were aware of [the
> claimant's] obesity.  Thus, although the ALJ did not explicitly
> consider [the claimant's] obesity, it was factored indirectly into the
> ALJ's decision as part of the doctor's opinions.

*Rutherford,* 399 F.3d at 552-53 (*quoting Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004).

As in *Rutherford,* we find that a remand for explicit consideration of Watson's obesity

would not affect the outcome of this case.  Here, Watson did not allege obesity as a disability in

either her application or at the hearing.  *See Woods v. Barnhart*, 2005 WL 1923554 at *1

---

[9]Watson testified that she first experienced problems with blood clots in October 2004
but had not had any significant problems since April 2005 (AR 560).  While she sought treatment
for occasional pulmonary complaints related to her asthma, the medical records show no
evidence of blood clots or pulmonary emboli after December 2004 (AR 179; 380; 384; 489).

[10]The Social Security Administration issued *SSR* 02-01p to provide guidance on how to
evaluate obesity-related disability claims.  *See SSR* 02-01p, 2000 WL 628049.

(E.D.Pa. 2005) (remand not necessary since claimant never raised obesity as an impairment or limitation before the ALJ, and did not specify or discuss how her obesity further impaired her ability to work either in her application, during her consultative examination or at the hearing). Moreover, nothing in the medical records suggest that Watson's alleged obesity was a factor in her medical conditions or her functional level. *See Balanian v. Barnhart,* 2005 WL 2886215 at *3 (E.D.Pa. 2005) (court declined to remand since claimant did not testify that her weight was a problem and her doctors' evaluations did not provide that her weight contributed to her ailments); *Woods,* 2005 WL 1923554 at *1 n.2 (finding it noteworthy that no physicians' reports or notations included in the record mention or discuss how the claimant's obesity further contributed to her limitations or impaired her ability to work). Finally, the ALJ considered the assessment of Dr. Kumar, the state agency reviewing physician, who was aware that Watson was morbidly obese, but did not mention or find that her obesity contributed to any impairment. *Rutherford,* 399 F.3d at 553 (because doctors were aware of claimant's obesity, ALJ's adoption of their conclusions constituted satisfactory if indirect consideration of that condition); *Woods,* 2005 WL 1923554 at *1 (ALJ's adoption of physician's conclusions who was aware of claimant's obesity constituted satisfactory consideration of the impairment). Accordingly, the ALJ's failure to explicitly address Watson's obesity does not warrant remand.

Watson next challenges the ALJ's credibility determination. An ALJ must consider subjective complaints by the claimant and evaluate the extent to which those complaints are supported or contradicted by the objective medical evidence and other evidence in the record. 20 C.F.R. § 404.1529(a). Subjective complaints must be seriously considered, whether or not they are fully confirmed by the objective medical evidence. *See Smith v. Califano*, 637 F.2d 968 (3rd Cir. 1981). The ALJ as the finder of fact can reject, partially or fully, subjective complaints if he finds them not credible based on other evidence in the record. *Baerga v. Richardson,* 500 F.2d 309, 312 (3rd Cir. 1974). The ALJ is empowered to evaluate the credibility of witnesses and his determination is entitled to deference by this Court. *See Van Horn v. Schweiker*, 717 F2d 871, 873 (3rd Cir. 1983).

14

In his assessment of Watson's credibility, the ALJ found that her statements concerning the intensity, duration and limiting effects of her symptoms were not entirely credible (AR 25). The ALJ noted that she was able to attend to her personal needs, help with chores and grocery shop with assistance (AR 25).  He further noted that she went fishing twice in the past year and attended a business institute part time (AR 25).  He noted that although she had been advised to stop smoking on numerous occasions by her doctors, she continued to smoke, and the frequency of her claimed asthma attacks were not supported by the record (AR 25).  The ALJ observed that although she alleged limitations stemming from depression and anxiety, her mental health treatment had been sporadic, and Dr. Yohe opined that her mental condition would not affect her ability to sustain work-related activities (AR 25).  Finally, the ALJ recognized that Watson had been hospitalized in August 2005 for depression, but did not seek professional mental health treatment until October 2005, and she testified that medication helped her condition (AR 26).

Watson argues that the ALJ selectively "pick[ed]" the testimony which supported his credibility determination without acknowledging other testimony that she contends supported her credibility.  Contrary to Watson's argument, we find no error in the ALJ's credibility assessment. The ALJ may consider a claimant's daily activities in assessing credibility, *see* 20 C.F.R. §§ 404.1529(c)(3)(i) and 416.929(c)(3)(i), and Watson testified to all the above activities at the administrative hearing.  Moreover, we fail to see how the ALJ mischaracterized her testimony in this respect.  For example, while Watson claims she was unable to do household chores, she specifically testified that she occasionally washed dishes and grocery shopped with assistance (AR 561).  Similarly, we reject her contention that the ALJ's characterization of her school attendance as "part-time" was "hopelessly inadequate."  Watson testified that she was supposed to attend business school four days per week, but was only physically able to attend two days per week (AR 564).

Finally, we reject Watson's contention that the ALJ's credibility analysis was further flawed since he failed to consider the reasons for her sporadic mental health treatment.  *Newell,* 347 F.3d at 547 (ALJ must not draw inferences about an individual's impairments from a failure

15

to seek regular medical treatment without first considering the explanation for the failure to seek treatment); *see also SSR* 96-7p, 1996 WL 374186 at *7.  Watson testified that she discontinued counseling in December 2004 due to a loss of insurance (AR 551).  However, as the ALJ noted, prior to that time frame she only treated with Dr. Yohe between May 20, 2004 and June 10, 2004 (AR 25).  Moreover, we observe that when she was seeking mental health treatment, Dr. Yohe reported that she failed to keep her appointments and dropped out of treatment before her response could be evaluated (AR 161).  Finally, the medical record reflected that Watson only sporadically took her antidepressant medications which were still prescribed for her, and declined an appointment with a psychiatrist when seen at Stairways in October 2005 (AR 311; 385; 508).  In short, we find that all of the ALJ's findings regarding Watson's credibility are supported by substantial evidence.

Watson next challenges the ALJ's decision to discount Dr. McLaughlin's opinion that she was temporarily disabled from November 22, 2004 to February 22, 2005 due to asthma and pulmonary emboli.  It is well settled in this Circuit that the opinion of a treating physician is entitled to great weight and can only be rejected on the basis of contrary medical evidence.  *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3rd Cir. 1988).  However, an ALJ may reject the opinion of a treating physician if it is "conclusory and unsupported by the medical evidence."  *Jones v. Sullivan*, 954 F.2d 125, 129 (3rd Cir. 1991).  When medical testimony conflicts or is inconsistent, the ALJ is required to choose between them.  *Cotter v. Harris*, 642 F.2d 700, 705 (3rd Cir. 1981).  In making that choice, a treating physician's conclusions are to be examined carefully and accorded more weight than a non-treating physician's opinion.  *Podedworny v. Harris*, 745 F.2d 210, 217 (3rd Cir 1984).  Where an ALJ chooses to reject the opinion of a treating physician, he must adequately explain in the record his reasons for doing so.  *Sykes v. Apfel*, 228 F.3d 259, 266 (3rd Cir. 2000) ("Where the Secretary is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence.").

Here, the ALJ found that Dr. McLaughlin's opinion was conclusory and unsupported by

16

his own progress notes (AR 26).  The ALJ noted that when seen by Dr. McLaughlin on

November 29, 2004, Watson was reportedly doing very well, and there was no cough, sputum

production, dysuria, hematuria, hemoptysis or hematermesis (AR 26).  When seen on January 13,

2005, Watson had no cough, sputum production or other concerns, and Dr. McLaughlin reported

that her lungs were clear to auscultation (AR 26).  Accordingly, the ALJ  assigned "no special

significance" to Dr. McLaughlin's opinion that Watson was temporarily unable to work (AR 26).

We find no error in the ALJ's assessment of Dr. McLaughlin's opinion.  As the ALJ

pointed out, Dr. McLaughlin did not provide any narrative explanation or specific findings to

support his assessment.  It is well settled that an ALJ may reject the opinion of a treating

physician if it is "conclusory and unsupported by the medical evidence."  *Jones v. Sullivan,* 954

F.2d 125, 129 (3rd Cir. 1991).  Moreover, as the ALJ observed, Dr. McLaughlin's opinion was

unsupported by the clinical findings as set forth in the progress notes.  Watson contends that in

rejecting Dr. McLaughlin's opinion, the ALJ ignored certain evidence favorable to her in

violation of *Cotter v. Harris*, 651 F.2d 481, 482 (3rd Cir. 1981).  The ALJ however, is not

required to specifically reject every notation in the medical record that is potentially favorable to

the claimant.  *Cotter* requires that the ALJ indicate that he considered all the evidence, and

provide some explanation as to why he rejected probative evidence that would have suggested a

contrary disposition; the ALJ "is not required to supply a comprehensive explanation for the

rejection of evidence; in most cases, a sentence or short paragraph would probably suffice."

*Cotter*, 650 F.2d at 482.  A review of the ALJ's decision reveals that he considered the relevant

evidence of record.  Finally, and most notably, we observe that any error in the ALJ's decision to

discount Dr. McLaughlin's opinion is harmless in light of the fact that he considered Watson

temporarily disabled for a period of only three months and did not opine that she had any

impairment that would preclude all work activity for at least twelve months as required by the

Act.  *See* 42 U.S.C. §§ 423(d)(1)(a); (d)(2)(A); 1382c(a)(3)(A), (B).

Watson further argues that the ALJ's analysis was faulty with respect to the

vocational/medical report from Action Incorporated relative to her mental impairments.  As

previously indicated, Mr. Topalanchik and Dr. Refice opined that Watson's mental impairments met the requirements of Listings 12.04 (Affective Disorders) and 12.08 (Personality Disorders) (AR 495).  Mr. Topalanchik further opined that Watson had no residual functional capacity (AR 496).  The ALJ found their report was "quite conclusory" (AR 26).  He noted that neither Dr. Refice nor Mr. Topalanchik examined Watson or had a treatment relationship with her (AR 26). Therefore, the ALJ assigned no special significance to their opinions (AR 26).  Watson contends that the ALJ should have accorded similar weight to this report that he gave to Dr. Golin's report, the state agency reviewing psychologist, who also reviewed the medical evidence of record but concluded that Watson's mental impairments did not meet or equal the same listings (AR 334-346).  We find no error in this regard.

In essence, the ALJ was presented with two inconsistent opinions concerning the nature and severity of Watson's alleged mental impairments.  We note, however, that neither Dr. Refice nor Dr. Golin were treating physicians and therefore their opinions were not "controlling." Neither of these individuals had a treatment relationship with Watson that enabled them to provide a "detailed, longitudinal picture" of Watson's mental impairments.  *See* 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2).  Moreover, applying the deference factors set forth in the regulations, it is apparent that neither opinion is entitled to significantly more weight than the other.  Under these circumstances, we are of the opinion that the ALJ is entitled to choose among such opinions.

In this case, the ALJ concluded that based upon his independent review of the evidence, Watson's testimony and her demeanor, Dr. Golin's opinion that she was not disabled was "correct" (AR 27).  The choice to credit Dr. Golin's opinion is reasonable in light of the fact that Dr. Golin's opinion is consistent with the record as a whole.  No other physician, treating or examining, opined that Watson was incapable of working due to her mental impairments.  In fact, Dr. Yohe, Watson's own treating psychiatrist, specifically opined that she had no difficulties performing activities of daily living and her ability to sustain concentration, persistence and pace was unaffected by her mental condition (AR 164).  He further found her only slightly limited in

her ability to understand, remember and carry out detailed instructions; make simple work-related decisions; and respond appropriately to pressures and changes in a routine work setting (AR 166). Finally, while Dr. Yohe noted that Watson had difficulty getting along with others at times, she was only slightly limited in her ability to interact appropriately with the public, supervisors and co-workers (AR 164-166).

Likewise, Dr. Dale, an examining psychologist, concluded that Watson was only moderately limited in her ability to understand, remember and carry out instructions; interact appropriately with the public, supervisors and co-workers; and respond appropriately to pressures and changes in a routine work setting (AR 332). Dr. Golin specifically assigned Dr. Dale's opinion great weight and adopted his assessment in rendering his opinion (AR 349). We therefore find that the ALJ's decision to assign no significant weight to the opinion of Dr. Refice and Mr. Topalanchik is supported by substantial evidence.

The remaining arguments raised by Watson lack merit and warrant little discussion, but we shall address the arguments briefly. Watson contends that the totality of the evidence shows that she is markedly impaired in at least two of the Part B categories and that she should have been found disabled. To fall within the listed impairments of 12.04 (Affective Disorders) and/or 12.06 (Anxiety Related Disorders), a claimant must meet Part A, which is a set of medical findings, and either Part B or C, which are sets of impairment-related functional limitations. *See* 20 C.F.R. Pt. 404, Subpt. P, Appx. 1.[11] The listing requires that the claimant offer evidence of at

---

[11]There is no evidence in the record to support a finding that the Part C criteria of 12.04 (Affective Disorders) were met, which requires:

> C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

> 1. Repeated episodes of decompensation, each of extended duration; or

least two of the four following restrictions: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. *See* 20 C.F.R. Pt. 404, Subpt. P, Appx. 1, 12.04B and 12.06B. "Marked" means more than moderate but less than extreme. *See* 20 C.F.R. Pt. 404, Subpt. P, Appx. 1, 12.00C.

Here, the ALJ found that Watson had no more than moderate limitations in activities of daily living; maintaining social functioning; or maintaining concentration, persistence or pace; and there was no evidence of any episodes of decompensation of extended duration (AR 24). In support of his assessment, the ALJ cited to Dr. Golin's opinion, the lack of findings by treating or examining physicians and Watson's own testimony (AR 24). We conclude, therefore, that the ALJ's determination that Watson did not meet the criteria in Listings 12.04 (Affective Disorders) and/or 12.06 (Anxiety Related Disorders) is supported by substantial evidence.[12]

_____

> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, Appx. 1, 12.04C.

Nor is there any evidence in the record to suggest that Watson had a complete inability to function independently outside the area of her own home as required by the Part C criteria of 12.06 (Anxiety Related Disorders). 20 C.F.R. Pt. 404, Subpt. P, Appx. 1, 12.08C.

[12]To the extent Watson seeks to rely on a psychological report dated June 8, 2006 (AR 537-542) in support of her argument that she is markedly limited in at least two Part B criteria, we cannot consider this report in our substantial evidence review of the ALJ's decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3rd Cir. 2001). *Matthews* held that in order to qualify for a remand option, three requirements must be satisfied: (1) the additional evidence must be "new"; (2) it must be "material" to determination of the claimant's disability benefits claim; and (3) there must be "good cause" for the claimant's failure to present the new evidence in a prior proceeding. *Matthews*, 239 F.3d at 593 ("[W]hen [a] claimant seeks to rely on evidence that was

Finally, Watson claims that the ALJ's residual functional capacity ("RFC") determination is flawed since he erred in his evaluation of her physical impairments and mental impairments. "'Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3ʳᵈ Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3ʳᵈ Cir. 1999); *see also* 20 C.F.R. § 404.1545(a). An individual claimant's RFC is an administrative determination expressly reserved to the Commissioner. 20 C.F.R. § 416.927(e)(2). In making this determination, the ALJ must consider all evidence before him. *Burnett*, 220 F.3d at 121. Because we have already concluded in connection with preceding related arguments that the ALJ's findings in these areas are supported by substantial evidence, we find no error in the ALJ's RFC assessment.

## IV. Conclusion

Based upon the foregoing reasons, the Commissioner's final decision will be affirmed. An appropriate Order follows.

---

not before the ALJ, the district court may remand to the Commissioner but only if the evidence is new and material and if there was good cause why it was not previously presented to the ALJ.").

In this case, although Watson has not specifically requested a remand on the basis of this report, we find she has failed to demonstrate that a new evidence remand is warranted. The relevant time period at issue in this case is between October 2, 2004, Watson's alleged disability onset date, and January 25, 2006, the date of the ALJ's decision (AR 28; 94). The psychological report post-dates the ALJ's decision in this case by five months and does not relate to the time period for which benefits were denied. *See e.g., Wilson v. Halter*, 2001 WL 410542 (E.D.Pa. 2001), *aff'd in an unpublished opinion*, 2002 WL 130415 (3ʳᵈ Cir. 2002) (medical reports relating to period of time after that addressed in the hearing are immaterial to the ALJ's decision and therefore do not warrant remand); *Ordo v. Apfel*, 2001 WL 1159856 (E.D.Pa. 2001) (remand not appropriate since new evidence did not relate back to time period for which benefits were denied). Consequently, a new evidence remand is not warranted with respect to this report.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CASSANDRA M. WATSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-221 Erie |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

AND NOW, this 14th day of May, 2007, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment [Doc. No. 11] is DENIED, and the Defendant's Motion for Summary Judgment [Doc. No. 13] is GRANTED. JUDGMENT is hereby entered in favor of Defendant, Michael J. Astrue, Commissioner of Social Security, and against Plaintiff, Cassandra M. Watson. The clerk is directed to mark the case closed.


                                              s/ Sean J. McLaughlin
                                              United States District Judge

cm: All parties of record.